IIowey, Judge,
delivered the opinion of .the court:
Plaintiff sues to recover of and from the United States the value of two certain adjoining rice plantations containing 1,265 acres, situate on the Savannah Eiver, in South Carolina. Said land is the rice land part of a tract of 3,700 acres.
Under and by virtue of certain acts of Congress officers and agents of the United States erected, built, and maintained, and are now building, erecting, and ■ maintaining, across the Savannah, and in the bed of the stream, certain *494 ' dams, draining walls, and other obstructions above and below the properties mentioned in the petition, thereby preventing the natural flow of the water through, in, and along the natural bed of the river. The dredged material necessary to be taken from the premises above and below the properties mentioned was so dumped as to raise the river several feet, and .the dredged material dumped along and with the other obstructions with the dams in the bed of the stream and the draining walls caused the waters to recede and flow backward' to such an extent as to raise and elevate the water above the ordinary height of the river along its natural bed at and above the point where the dams, draining walls, dumped materials, and obstructions were situated. These dams, draining walls, and obstructions were necessary to make the improvements effective, but they backed the waters of the river in and upon plaintiff’s land to such a height as to flood his property, thereby preventing the natural outflow of water from the land. The findings show the height of the water to be approximately 2 feet over and above the natural and ordinary level of the river, and the plaintiff’s land became so saturated as to prevent the necessary outflow from the plantations. Because of this and the filling of the ditches through the land the plantations became' submerged, the crops were destroyed, and the drainage of the land for purposes of rice culture was prevented. Superinduced additions of water actually invaded the rice lands so as to permanently injure' and destroy the property for the uses to which it has been devoted for many years. Rendered useless for purposes of rice culture (or for other agricultural- purposes) and abandoned, plaintiff’s contention is that the land has been taken by the Government, for which compensation should be made.
Defendants admit that to use the lands drainage was necessary between the ebb and flood tide; that is, between high and low tide. They admit injury to the property, but say that the lands could be drained into Savannah back river, and from thence to the rear into the swamps by the construction of a -canal from, in and through the lands. Urging that though the water remained standing in the ditches and that there was an accumulation of it upon the *495 lands, it is likewise insisted that this water came from rains, and the flowage of surface water from the lands above and below and not from the river, as the embankment, dikes, and levees constructed along the river front combined to prevent overflow.
These contentions of alleged facts, in so far as the court has found them to be supported by the evidence, have been incorporated into the findings.
The material and ultimate facts appear in the seventh finding. The direct effect of the Government work upon the Savannah Eiver was to raise its level at plaintiff’s plantation and to maintain the mean low water above its natural point, thereby rendering the flooding and drainage of plaintiff’s land impossible for rice cultivation. The raising of the low-water mark caused the waters of the river to seep upon and percolate the plantations, resulting in permanently flooding the lands approximately to the depth of 22 inches and upon the same level as the water level of the river. In consequence of the seepage the lands became boggy, sogged, and sour and unfit for the cultivation or production of rice, or, so far as known, of anything useful in agriculture. This condition became permanent and the rice lands affected became useless and valueless.
Was this a taking of private property in the exercise of the right of eminent domain by the Government for which compensation should be made within the meaning of the fifth amendment to the Constitution ? It is the contention of the Government that plaintiff’s submerged lands were on a navigable river always subject to overflow at flood tide, inasmuch as the adjoining river was a tidal stream. That plaintiff’s lands had originally been reclaimed by the construction of an embankment, dike, or levee (along that part fronting the river), which served to protect the lands from overflow at high tide, and that as the Government was -improving the stream for navigation it was also necessary for the planters in that locality to construct freshet banks above the plantations from the river to the foothills, so that the lands and plantations below might be protected from water coming in from the lands above.
*496 It is the further contention of defendants that the flooding here was temporary, which did not amount to a taking; and the flooding not being the result of negligent construction or maintenance of the improvements authorized amounts only to a consequential injury not actionable; in other words, the injury was damnum absque injuria.
Defendants rely upon Mills v. United States, 46 Fed Rep., 738; High Bridge Lumber Co. v. United States, 69 ib., 320; also upon Gibson v. United States, 166 U. S., 269; Marchant v. Penn. R. R., 153 U. S., 280; Myer v. Richmond, 172 17. S., 82; Walls v. United States, 44 C. Cls. R, 482; Tompkins v. United States, 45 ib., 66.
The findings having disposed of the contentions respecting the character of the flooding, and the court having found that there was a permanent flooding of the land to the destruction of the property, the authorities cited are inapplicable. Thus, in Walls v. United States defendants were held liable for land permanently submerged, but overflows caused merely by infrequent freshets were held not to amount to a taking. In Tompkins v. United States, supra, a small fraction of land appeared to have been washed over and away. After a break in the dam other land claimed for was shown to have been in cultivation, and the court held that the damage arising from the risk of overflow should be regarded as consequential.
In Mills v. United States it was shown that the Government bad erected a “ cross-tides dam ” between two islands. This cut off the flow of all water from the stream connecting the front and back rivers, and by raising both high and low water levees in the front river destroyed the facilities for draining the adjoining lands into the front river and likewise rendered it necessary to raise the levees around the rice fields to prevent flooding in time of high water. On appeal it was held that the case was one of consequential injury remediable by the owner.
In High Bridge Lumber Co. v. United States commissioners had been instructed not to consider any damages that might result to adjacent property by reason of any overflow, or any other damages that might result by the con *497 struction or operation of a lock and dam. On appeal the case was stated on the circuit as an “ anticipated diversion of the current of the stream from one side of the river to the other, thereby inconveniencing the conduct of the business (of the complaining company) and the anticipated raising of the level of the stream causing overflows and a consequent damage to mill machinery and to the use of adjacent lands for the purposes of its (plaintiff’s) business.” Mr. Justice Lurton, for the court, held that these were injuries not directly the result of the taking of the small parcel of land desired by the Government, but damage anticipated and consequent upon the construction and maintenance of the lock and dam; and he added, that if the land condemned had been acquired by purchase, the same result to the remainder might be as well anticipated, or, if the condemned parcel had belonged to a different owner, the complaining party would be subjected to the same class and kind of injury. Such anticipated damages did not constitute a taking. In Marchant v. Penna. B. B., plaintiff sought to recover for injuries caused to his property by the smoke, dust, noise, and vibration arising from the use of the railroad’s engines and cars, the necessary consequence and incidents of the operations of a steam railway. Plaintiff was the owner of a lot upon which he had erected a building occupied as a dwelling and business house. The elevated railroad constructed did not occupy any portion of the plaintiff’s land, nor did it trench upon Filbert Street, extending in front of the plaintiff’s property. Opposite plaintiff’s lot the railroad structure occupied its own land. On appeal the case was disposed of substantially by the statement that the construction of an elevated track on private land abutting on a public street in a city gave to the owner of the land on the opposite side of the street no claim to recover consequential damage or injury.
In Meyer v. Richmond, supra, it appears that plaintiff was the owner of a lot fronting on a street between two other streets. Under an authorized ordinance a railway company had occupied the street on which plaintiff’s lot (and two buildings) were located with its tracks, sheds, and fences. The railway company had provided for pedestrians, for *498 whom the company was required to provide an overhead bridge and stairway approaches. The averment was that this was an obstruction that arrested travel along the street and substantially injured and destroyed plaintiff’s property, and it was contended that the city had no right to authorize such obstructions to be placed in the street without proper legal proceedings for that purpose and the making of just compensation to the abutting owners. The case seems to have been a common-law action of trespass. The judgment of the lower court refusing damages was affirmed by the appellate court.
In Gibson v. United States no water was shown to have been thrown back on plaintiff’s land by the building of a dike. The dike itself did not come into physical contact with plaintiff’s land and was not shown to have been the cause of any such physical contact in any other way. Free egress and ingress to and from a landing on and in front of the plaintiff’s farm to the main or navigable channel of the river so destroyed the landing of the plaintiff as to prevent the, shipment of products from and supplies to plaintiff’s farm for the greater part of the gardening season because of the dike obstructing the passage of boats. But access to the navigable portion of the stream was not entirely cut off, as plaintiff could communicate with the navigable channel through the chute and at any time could haul to the channel. Damages resulting from the prosecution by the Government of its improvements were held (affirming this court) not recoverable.
This case was followed by that of Scranton v. Wheeler, 179 U. S., 141, where compensation was denied on a claim for the taking of private property for public use without just compensation to an owner of land where access from the land to navigability was permanently lost by reason of the construction, under authority of Congress of a pier resting on submerged land away from, but in front of, the private owner’s upland.
In considering the distinction between a taking and merely consequential damages Mr: Justice McKenna said, in Bedford v. United States, 192 U. S., 225, affirming Lynah’s case, that the works were constructed in the bed of the *499 river, obstructed the natural flow of its water, thereby causing, as a direct consequence, the overflow of Lynah’s planta-, tion. That in Bedford’s case the works were constructed along the banks of the river and- their effect was to resist erosion of the banks by the waters of the river. There having been no other interference with natural conditions the damage to Bedford’s land, “ if assignable to the works at all,” was but an incidental consequence of the works. Bed-ford’s case, however, is not this case.
It is unnecessary to notice other cases of collateral damage not amounting to a taking, but now to recur to those cases which we think fully sustain the contention of the plaintiff in this case that his land was taken within the meaning of the fifth amendment.
In United States v. Welch, 217 U. S., 333, some of the cases where damages were the only result were reviewed. The court thought that the argument on a claim for compensation by Welch for his private right of way was only confused by reference to cases like Gibson’s. It became settled by the Welch decision that a private right of way is an easement and is land, and that if this private right of way be destroyed and ended a destruction for public purposes may as well be considered a taking as would an appropriation for the same end.
In United States v. Grizzard, 219 U. S., 180, it was said that the trend of opinion was toward the decision announced in that case. It appeared there that an amount had been allowed for land actually taken and a like sum for the easement of access likewise taken. The flooding and tailing of a part of plaintiff’s farm had depreciated the usefulness and value of the remainder and the owner was not justly compensated by being paid for that actually appropriated and leaving him uncompensated for the depreciation over benefits to the remaining land. Where there was a taking by flooding permanently, the court said there was a taking as in Pumpelly v. Green Bay Co., 13 Wall., 166; United States v. Lynah, 188 U. S., 445; United States v. Williams, 188 ib., 485; United States v. Welch, 217 U. S., 333.
In the case at bar no proceedings had been taken to formally condemn the land'. But there is no essential difference *500 between this and the cases mentioned, and especially between this and Lynah’s claim, supra. The two plantations of this owner adjoined Varnezobra plantation, which is involved in the Lynah case, supra, on one side and Beech Hill, involved in the Williams case, supra, on the other. In those cases it appeared that destruction was caused as the result of the raising of the level of the river with the direct result that by seepage and percolation the water rose until the water level in the land gradually rose to the height of the increased water level in the river, and the superinduced addition of water in the plantation was raised about 18 inches. The same conditions exist in the present case, supplemented by the shoaling of water in back river and by the deposits there of mud and sand whereby the ditches were filled and could not be drained. By seepage and percolation through the embankment the water became raised on the front of the river to such an extent that the overflow could not be controlled. By seepage and percolation caused by the deposits and obstructions in back river the property also became an irreclaimable bog unfit for the purpose of rice culture or any other known agriculture and deprived of all value. This was the necessary result of’ the work undertaken by the Government and was a taking within the meaning of the constitutional provision.
From the evidence the court is unable to find that drainage might have been accomplished so as to reclaim the land. Though, as said in some of the cases, there is theoretically no limit to that which engineering skill may accomplish, that vast tracts have been reclaimed by levees and other works, so that courts may believe flooding may be prevented, there is nothing tangible or certain disclosed by the record on the proposition that the land mentioned in this case may be the subject of reclamation. This court is without sufficient proof to make a finding that by the digging of canals plaintiff’s land may be reclaimed for rice culture or for any other profitable purpose. The digging of canals wide and deep enough for the purpose indicated would probably require the owner to invade the lands of others as well as interfere with the improvements erected by the Government. Aside from the question of fact involved in the defendants’ suggestion, *501 we know of no authority in law requiring the owner of submerged lands to embark in any undertaking involving such uncertain results.
There is no proof to sustain the supposition that with the expenditure of an additional sum the claimant could have warded off the consequences of the overflow. The presumption was not indulged in Lynah’s case and in Williams’s case, ante, that the expenditure of additional sums could have prevented the flooding of the lands so serious as to amount to a taking. The present case must be governed by like considerations growing out of the proof and not upon an intangible belief growing out of a mere presumption.
Judgment will be entered for plaintiff in the sum of $37,950. But, meantime, and before the judgment is certified, plaintiff is required to furnish a survey definitely ascertaining the lands taken, by metes and bounds. United States v. Sewell, 217 U. S., 601. When the metes and boiinds are so furnished the judgment will be subject to correction according to what the survey discloses. That is to say, the judgment is subject to be diminished by the number of acres of land disclosed by the survey should this survey show the acreage overflowed and submerged to be less than the number of acres set forth in the petition.
Before payment of the amount properly due according to the survey plaintiff will execute a conveyance granting and conveying his title to the-lands to the United States.